Darryl M. Woo (SBN 100513)
    dwoo@velaw.com
Mortimer H. Hartwell (SBN 154556)
    mhartwell@velaw.com
Siho (Scott) Yoo (SBN 311202)
    syoo@velaw.com
VINSON & ELKINS L.L.P.
555 Mission Street, Suite 2000
San Francisco, CA   94105
Telephone: (415) 979-6900
Facsimile:  (415) 651-8786

Attorneys for Plaintiff
Keysight Technologies, Inc.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| KEYSIGHT TECHNOLOGIES, INC., f/d/b/a AGILENT TECHNOLOGIES, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR BREACH OF CONTRACT AND SPECIFIC PERFORMANCE** |
| vs. | |
| MENTOR GRAPHICS CORPORATION, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Keysight Technologies, Inc. f/d/b/a Agilent Technologies, Inc. ("Keysight" or "Plaintiff"), by and through its undersigned counsel, for their Complaint against Defendants Mentor Graphics Corporation ("Mentor" or "Defendant"), alleges as follows:

## INTRODUCTION

1.      On or about June 9, 2003, Agilent Technologies, Inc. ("Agilent") and Tiburon Design Automation, Inc. ("Tiburon") entered into a binding Software License and Distribution Agreement, effective as of that date, and as amended over the years since then ("the Agreement"). Exhibit 1.  As more fully set forth below, pursuant to its terms and conditions, and supported by good and adequate consideration, the Agreement grants Keysight a license to certain Software, as that term is defined in the Agreement.

2.      Plaintiff Keysight was formed out of Agilent's Electronic Measurement Group in or about 2014, and became a new company initially owned by the stockholders of Agilent and later a company independent of Agilent.  Keysight succeeded to all rights and obligations of Agilent with respect to the Agreement, as acknowledged by Tiburon on or about April 29, 2014.

3.      According to its website (www.tiburon-da.com, which automatically redirects to www.mentor.com/products/fv/tiburon/), Tiburon became part of Defendant Mentor in 2015. Among other things, Tiburon provides Verilog-A and Verilog-AMS simulation components for SPICE simulators, a type of general purpose electronic circuit simulator.  SPICE is an acronym for Simulation Program with Integrated Circuit Emphasis, and is a program used in integrated circuit and board-level design to check design integrity and predict circuit behavior.  Upon information and belief, Mentor has succeeded to all rights and obligations of Tiburon, including those under the Agreement.  In or about March 2017, Mentor was acquired by, and now is a subsidiary of Siemens Industry, Inc. ("Siemens").

4.      As more fully set forth below, Mentor is in breach of one or more of its obligations to Keysight under the Agreement.  In particular, Mentor was and is obligated to provide certain maintenance support for the Software, including but not limited to providing corrections for Software defects and providing Software enhancements and updates with respect to at least two

Keysight products: GoldenGate RFIC Simulation Software ("GoldenGate") and Advanced Design System ("ADS").  Generally speaking, both GoldenGate and ADS are used to analyze and simulate the designs of integrated circuits for communications devices.  In breach of its obligations, Mentor failed to provide the required maintenance support.  Keysight has provided multiple notices of these failures to Mentor, which is in receipt of them, but despite Keysight's repeated requests for maintenance support under the Agreement, certain defects and problems have gone uncured for more than thirty (30) days, and in several instances, for more than a year.  Mentor has expressly acknowledged that at least seven (7) of the reported, uncured defects and problems with the Software are covered under Mentor's maintenance and support obligations under the Agreement.

5.     In particular, at least eight (8) of the defects and problems in Mentor's Software are, and have been identified to Mentor as, "critical" or with high priority, including problems with the Mentor Software causing system failures or "crashes" in Keysight products.  In numerous instances, Keysight reported to Mentor that Mentor's Software crashes or causes the Keysight products to halt the simulation or analysis of circuit designs – a key function of Keysight's products.  Critically as to ADS, the Mentor Software causes a DC convergence error, which prevents Keysight's customers from performing DC simulations that are fundamental to the simulation process and a key reason customers buy ADS in the first place.  These are just a few examples; there are many more examples of Mentor's failures to provide maintenance support under the Agreement that have gone uncured for more than 30 days, including Mentor's failure to provide operating system compatibility, Mentor's failure to support multi-technology simulations, and Mentor's failure to update the Software to match up with new compilers, all of which are critical to the proper functioning of Keysight's products incorporating the Mentor Software.

6.     As more fully set forth below, at least by letter dated July 19, 2017 ("Notice"), and as supplemented by a further letter dated August 8, 2017 ("Supplement"), Keysight provided Mentor written notice pursuant to subsection 15.9 of its failure to provide the required maintenance support pursuant to subsection 2.1 of the Agreement, including Mentor's failure to

cure the Software defects.  In particular, Keysight provided written notice of "Mentor's failure to provide the required maintenance support set forth in Exhibit B-1 to the Agreement," by the means listed in subsection 15.9, and to persons and addresses including those listed in subsection 15.9, and to a person designated by Mentor to receive notices under the Agreement.  Exhibit 2. Mentor did not object to this notice based on any lack of formalities or lack of compliance with subsection 15.9 of the Agreement, but merely expressed its disagreement that the Notice "provides proper notice and opportunity to cure any alleged failure by Mentor [] to provide maintenance support."  At the time of its receipt of such notice and through prior written notice, Mentor was fully aware of the provisions of the Agreement as amended, and the ramifications of Mentor's failures to cure them, including Keysight's right to exercise the fully-paid up license to the Software granted to Keysight under subsection 2.1 as amended by Amendment No. 6.  As a result, and as more fully set forth below, Keysight fully complied with the notice requirements of the Agreement, or alternatively, Mentor had waived its right to receive formal notice pursuant to the notice requirements of subsection 15.9.

7.      Consequently, Keysight has performed all acts required of it under the Agreement, and as more fully set forth below, Mentor is in breach of the Agreement, and Keysight is entitled to remedies for Mentor's breach.  Such remedies include, but are not limited to, specific performance of certain obligations by Mentor, including Mentor's obligation to provide Keysight with the Software source code on a fully-paid up licensed basis.

## **PARTIES**

8.      Plaintiff Keysight is a Delaware corporation having its principal place of business in Santa Rosa, California, and a party to the Agreement.

9.      Upon information and belief, Defendant Mentor Graphics Corporation is an Oregon corporation having its principal place of business in Oregon, and having operations and places of business at several locations in California, including but not limited to, El Segundo, Irvine, San Diego, Fremont, and Santa Rosa.

10. Upon information and belief, Mentor acquired Tiburon in or about October 2015. Tiburon was at the time a Delaware corporation with its principal place of business within Sonoma County in Santa Rosa, California. Upon information and belief, Tiburon is now part of Mentor and has no separate corporate existence. As noted above, upon information and belief, Mentor has succeeded to all rights and obligations of Tiburon, including those under the Agreement.

11. Upon information and belief, Mentor maintains a separate corporate existence, despite becoming a subsidiary of Siemens Industry, Inc. in a publicly announced transaction that closed in or about March 2017.

## JURISDICTION AND VENUE

12. Plaintiff's claim for breach of contract and specific performance is based on the written Agreement between the parties.

13. The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332(a)(1) (diversity) because Plaintiff Keysight and Defendant Mentor are citizens of different States and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

14. Keysight is inter alia entitled to the fully-paid up license to the Software source code granted to Keysight under subsection 2.1 of the Agreement as amended. In light of subsection 4.1 of the Agreement as amended by Amendment No. 6 (Exhibit 3), the value of this license, and hence, the amount in controversy, is greater than $75,000, whether cumulatively or independently.

15. This Court has general personal jurisdiction over Mentor because Mentor has continuous and systematic business contacts with California as demonstrated by the presence of its operations and offices in numerous cities within California, the operation of its Tiburon business unit, and the fact that Mentor has a designated agent for service of process in the State of California. Mentor has established minimum contacts with this forum such that the exercise of jurisdiction over Mentor would not offend traditional notions of fair play and substantial justice.

16. This Court also has specific personal jurisdiction over Mentor in this case because this case arises out of the interpretation and performance of the Agreement, which was executed,

1    performed, and/or to be performed, in Sonoma County, California, and because of Mentor's

2    breaches of the same, causing harm in California, as more fully set forth below.

3        17.    Venue is proper in Sonoma County and this district under 28 U.S.C. § 1391(b)(2), as

4    a substantial part of the events giving rise to Keysight's claim occurred in Sonoma County,

5    California, which is within this judicial district.  Further, the Agreement was entered into,

6    performed, and/or to be performed, in Sonoma County.  This action furthermore arises out of

7    certain conduct and/or omissions of Mentor that occurred in Sonoma County and elsewhere.

8                            **FACTUAL ALLEGATIONS**

9                **The Software License and Distribution Agreement**

10       18.    As alleged above, Keysight and Mentor are now parties to the Agreement, with

11   certain rights and obligations to each other.

12       19.    Under Section 2 of the Agreement, "LICENSE GRANT," Keysight has a license to

13   the Software, as defined.  Exhibit 1.

14       20.    Subsection 1.1 of the Agreement provides that "Software" means "the object code of

15   Tiburon's Verilog-A compiler, the associated run-time-environment and Verilog-A from model

16   example libraries provided by Tiburon to Agilent under this Agreement, including all

17   Enhancements thereto."  Exhibit 1.

18       21.    Section 6 of the Agreement provides, in pertinent part, that Tiburon [Mentor] will

19   provide to Agilent [Keysight] "ongoing maintenance and support for the Software" as set forth in

20   Exhibit B of the Agreement.  Exhibit 1.  Exhibit B of the Agreement in turn provides, among other

21   things, that Tiburon [Mentor] will provide maintenance and support for the Software, including

22   appropriate corrective action on any defect report it receives," providing Agilent [Keysight] "with

23   the necessary data or software to allow Agilent [Keysight] to distribute a correction to End Users"

24   (Section A) and "[p]roviding normal evolutionary enhancements and updates, including

25   instructions for implementation."  *Id.*

26

27

28

22.     Subsection 15.3 of the Agreement provides that "[t]he Agreement will be governed and construed in accordance with the laws of the State of California without regard to the choice of law provisions thereof."  Exhibit 1.

23.     Subsection 15. 9 of the Agreement provides that:

> [n]otices, invoices, payment or other correspondence required or permitted to be given under this Agreement will be in writing and will be deemed to have given if served personally, or if sent by overnight carrier, postage prepaid, or by facsimile, addressed to the addresses set forth below or such other addresses as the parties may designate by notice to the other.

Exhibit 1.

24.     Subsection 15.9 lists Marek Mierzwinski, 4549 Offner Lane, Santa Rosa, CA 95409, as where and to whom notices to Mentor are to be addressed, and Brian Buchanan, 1400 Fountaingrove Parkway, Santa Rosa, CA  95403, as where and to whom notices to Keysight are to be addressed under the Agreement.  Exhibit 1.

25.     At the time the Agreement was executed, Marek Mierzwinski was President & CEO of Tiburon.  Exhibit 1.  The address listed in subsection 15.9 of the Agreement, 4549 Offner Lane, Santa Rosa, CA, was Mr. Mierzwinski's private residence.  In 2008, Mr. Mierzwinski sold and moved out from this residence.  Upon information and belief, in the time since Mr. Mierzwinski moved out of 4549 Offner Lane, Santa Rosa, CA, no individual or entity affiliated with Tiburon/Mentor has ever resided at this address.

26.     Mr. Mierzwinski later left Tiburon in 2012 and consulted with Agilent.  He became an employee of Keysight in May 2015 where he is presently an R&D Engineer.

27.     As of the date of this Complaint, Keysight has received no notice in compliance with subsection 15.9 of the Agreement of any change of address or change of designated recipient for notices to be given under subsection 15.9 of the Agreement.  At some point in time at least before or during 2009, however, Tiburon submitted a Change Request Form requesting that Agilent substitute the address of 613 4th Street, Suite 208A, Santa Rosa, California, for the Offner Lane address.  The Change Request Form was Agilent's own form then used by its suppliers to notify Agilent of any change in address and payment information.  Thereafter, Agilent, and later,

Keysight, began sending notices, payments and other correspondence to Tiburon at the 613 4th Street address.  After Tiburon's acquisition by Mentor, Keysight began sending such notices, payments and other correspondence to other addresses and by other means as directed by Mentor, including by email to persons other than those listed in subsection 15.9, and Mentor has accepted same.

### Amendments and Extensions to the Agreement

28.     After executing the Agreement in June 2003, Tiburon and Agilent have since agreed on a series of amendments and extensions to the Agreement, including without limitation an extension dated October 27, 2016.  Exhibit 4.  By and through the parties' amendments and extensions, the term of the Agreement currently extends through and including October 31, 2017.

29.     On or about November 5, 2009, Agilent [Keysight] and Tiburon [Mentor] entered into Amendment No. 6, which among other things, provides:

> b) In section 2 LICENSE GRANT the following is added to the end of subsection 2.1: "Subject to the terms and conditions of this Agreement, Tiburon [Mentor] further grants to Agilent [Keysight] a fully-paid up, worldwide, perpetual license to use, copy and modify the Software source code, and to distribute object code versions of the Software or modifications to the Software by Agilent [Keysight] … which may only be exercised by Agilent [Keysight] upon Tiburon [Mentor], or any successor company: either (1) ceasing to do business in the normal course, or (2) *failing to provide the required maintenance support* set forth in Exhibit B-1 to this Agreement, *which failure is not cured within thirty (30) days after receipt of notice thereof* from Agilent [Keysight].

Exhibit 3 (emphasis added).

30.     Exhibit B-1 of Amendment No. 6 in turn provides, among other things, that with respect to the Software, Tiburon [Mentor] will take "appropriate corrective action on any defect report it receives," as well as provide "normal evolutionary enhancements and updates."  Exhibit 3.

### Mentor's Failure to Provide the Required Maintenance Support

31.     As alleged above, Mentor was and is obligated to provide certain maintenance support for the Software, including but not limited to providing corrections for Software defects and providing Software enhancements and updates.  In breach of these obligations, Mentor failed

COMPLAINT FOR BREACH OF CONTRACT AND        7
SPECIFIC PERFORMANCE – JURY DEMAND
5151395

1    to provide the required maintenance support.  Keysight has provided multiple written notices of

2    these failures to Mentor, which is in receipt of them, but despite Keysight's repeated requests for

3    maintenance support, Mentor's failures to provide maintenance support have gone uncured for

4    more than thirty (30) days, and in several instances, for more than a year.

5           32.    For instance, on September 16, 2015, Keysight notified Mentor in writing of twenty-

6    two (22) Software defects identified by Keysight ("the September 16, 2015 List").  Exhibit 5.

7    These defects include, for example, errors relating to DC currents or DC convergence; numerous

8    system failures or crashes that occurred while the Keysight products were running simulations or

9    when tuning the Software parameters; the Software's failure to support multi-technology

10   simulations; and the Software's failure to provide operating system compatibility.  *Id.*  This

11   written notice was provided to Mentor via Ravi Subramanian (Vice President & General Manager)

12   and Patrick O'Halloran (Principal Architect), and specifically requested that "a quick response"

13   from Mentor was needed.  *Id.*

14          33.    On October 11, 2015, Mentor provided its analysis of the defects referenced in the

15   September 16, 2015 List, and proposed a schedule for resolving those defects.  Exhibit 6.  Mentor

16   also confirmed that it expected to complete at least some of the defects that were prioritized and

17   deemed to be urgent during the week of December 7, 2015.  *Id.*  On or about December 2, 2015,

18   Keysight sent Mentor a follow-up email to check Mentor's progress on correcting the defects

19   identified in the September 16, 2015 List.  *Id.*  On December 4, 2015, Keysight again followed up

20   with Mentor to confirm that Mentor would start fixing the defects on December 7, 2015 as

21   Keysight's product "release is critically relying on fixing these issues."  *Id.*  These email notices

22   were sent to Ravi Subramanian and Patrick O'Halloran at Mentor.  *Id.*  Mentor did not correct the

23   defects about which it had received notice, but acknowledged its obligations to do so under

24   Amendment No. 6, inter alia, via an email dated June 13, 2016 (Exhibit 8), authored by

25   Mr. Subramanian, Mentor's Vice President and General Manager, and as more fully set forth

26   below, a person identified and directed by Mentor as to whom such notices should be addressed.

27

28

COMPLAINT FOR BREACH OF CONTRACT AND          8
SPECIFIC PERFORMANCE – JURY DEMAND
5151395

34.     On May 27, 2016, Keysight notified Mentor that at least some of the defects in the September 16, 2015 List remained uncured.  Exhibit 7.  Keysight requested in writing yet again that Mentor start work on correcting these defects that Mentor stated back in January 2017 it would be available to work on in April 2017.  *Id.*  On this occasion, Keysight attached a list of eight (8) identified defects to its notice, including two new defects relating to a compiler upgrade and a DC non-convergence error ("the May 27, 2016 List").  *Id.*  Except for the two newly added defects, all of the remaining defects previously included in the September 16, 2015 List continued to remain uncorrected.  *Id.*  Keysight emphasized the importance of the compiler problem, which required Mentor to correct, enhance or upgrade Tiburon Verilog-A libraries so the libraries match with Keysight's compilers.  *Id.*  This written notice was sent by email to Ravi Subramanian at Mentor.  *Id.*

35.     On June 13, 2016, after reviewing the defects in the May 2016 List, Mentor's Vice President and General Manager, Ravi Subramanian, responded that Mentor would work on at least seven (7) defects in compliance with its maintenance support obligations under the Agreement. Exhibit 8.  In particular, Mentor admitted that the Software's failure to provide operating system compatibility is a "bug/defect" and that six (6) other problems are "support and maintenance issues," all of which are covered under Mentor's maintenance support obligations under the Agreement.  *Id.*  Additionally, Mentor specifically promised that "Mentor will perform the work necessary to provide this support," and that "[o]ur technical team will address the issues."  *Id.*

36.     However, despite Keysight's repeated follow-up emails, Mentor failed to provide any update on its work associated with correcting the defects, and failed to correct most of the defects identified in the September 16, 2015 List and the May 27, 2016 List.

37.     Since January 2016, high level management teams for both parties have been in discussions over the uncured Software defects about which Mentor had received notice, including discussions regarding Amendment No. 6, by which Keysight has been granted, inter alia, a fully paid-up license as provided therein.  Such discussions included the parties' high level management teams such as Todd Cutler, Keysight's Vice President and General Manager; Joseph Reinhart,

Mentor's Vice President of Corporate Development and Investor Relations; Ravi Subramanian,

Mentor's Vice President and General Manager; as well as the parties' legal teams including Jake

Book, Mentor's in-house Corporate Attorney.  During these discussions, the parties discussed,

among other things, the Software defects, Mentor's failure to provide the required maintenance

support, and Keysight's right to receive a fully-paid up license of the Software in accordance with

the Agreement, in light of Mentor's failure to cure the defects within the time provided by the

Agreement.  Further, during these discussions Keysight repeatedly emphasized that its primary

interest is to have Mentor cure the defects pursuant to its maintenance support obligations since

Keysight cannot meet customer obligations without curing the defects in a timely manner.  But

Mentor refused and failed to cure the defects.

38.    Unable to obtain Mentor's compliance with its maintenance support obligations

under the Agreement, and even though this was Mentor's obligation, Keysight fixed eight (8) of

the defects that Keysight was able to fix without reviewing and/or modifying the Software source

code.  Additionally, Keysight was able to fix two (2) more defects with help from Mentor.

Keysight could not, however, fix those defects that were Software source code-dependent.  The

other defects identified in the September 16, 2015 List and the May 27, 2016 List remained

uncured for more than a year.  In response to its receipt of the July 19, 2017 Notice, Mentor

attempted to fix some of the uncured defects.  Even after Mentor received the July 19, 2017

Notice and did so, however, eight (8) defects identified in the September 16, 2015 List and the

May 27, 2016 List, which are Mentor's obligation to correct, and require review and/or

modification of the Software source code for correction, remain uncured as of the date of this

Complaint.  The remaining defects were the subject of the July 19, 2017 Notice letter and

specifically identified further in the August 8, 2017 Supplement.

39.    As of the date of this Complaint, at least four (4) defects that Mentor specifically

promised it would cure in compliance with its maintenance support obligation under the

Agreement, as to which Mentor had received notice and had been identified to Mentor in the

May 27, 2016 List, and identified again in the August 8, 2017 Supplement, remain uncured.

1  Mentor has failed to take appropriate corrective action and/or has failed to provide enhancements

2  and updates that remedy the defects as to which Keysight has provided Mentor with notice.

3  Mentor's failures remain uncured, including those remaining on the September 16, 2015 List, the

4  May 27, 2016 List, the July 19, 2017 Notice letter and August 8, 2017 Supplement (the

5  "Defects").  As of the date of this Complaint, such failures by Mentor to provide maintenance

6  support with respect to the Defects remain uncured for more than thirty (30) days since Keysight

7  provided written notice to Mentor of these failures at least pursuant to the July 19, 2017 Notice

8  letter and August 8, 2017 Supplement, and Mentor is thus in breach of its obligation to provide

9  maintenance support, at least under Section 2 of the Agreement, as amended.

10         40.     Mentor's breach has and continues to cause Keysight damages and irreparable harm.

11  Among other things, because Keysight is presently only in possession of the Software in object

12  code form, it is unable to remedy the remaining uncured Defects through its own efforts.  Such

13  inability to remedy the Defects is causing Keysight irreparable harm because, among other things,

14  Keysight is unable to fix the Defects for its end-user customers, thus suffering harm to Keysight's

15  reputation and market share.  For instance, at least one Keysight customer had escalated the DC

16  convergence and multi-technology simulation issues because these problems prevented them from

17  performing DC simulations.  The customer also refused to explore other business opportunities

18  relating to ADS with Keysight because of such failures and resorted to software tools offered by

19  Keysight's competitors, instead of continuing to use Keysight's.  Mentor's failure to cure the

20  defects about which it had received notice, and its failure and refusal to provide Keysight with the

21  Software source code, has caused, and is continuing to cause, damage and harm to Keysight's

22  business with its existing and potential customer base.

23              **Notice of Mentor's Failure to Provide the Required Maintenance Support**

24         41.     As alleged herein, Keysight has complied with the notice requirements of

25  subsections 2.1 and 15.9 of the Agreement.  At least by means of the July 19, 2017 Notice letter,

26  delivered and attempted to be delivered in accordance with the methods set forth in

27  subsection 15.9 of the Agreement, Keysight provided written notice of Mentor's failure to provide

28

COMPLAINT FOR BREACH OF CONTRACT AND       11
SPECIFIC PERFORMANCE – JURY DEMAND
5151395

the required maintenance support under the Agreement.  Exhibit 2.  The July 19, 2017 Notice

expressly states that "pursuant to subsections 2.1 and 15.9 of the Agreement, this letter will

provide written notice of Mentor's failure to provide the required maintenance support set forth in

Exhibit B-1 to the Agreement."  *Id.*  The notice further states that "under subsection 2.1 as

amended, Mentor's failure to timely cure results in Keysight being granted a fully-paid up, ...

license to use, copy and modify the Software source code, … as set forth in the Agreement (as

amended)."  *Id.*  Copies of the Agreement and Amendment No. 6 were also provided with the

notice letter.  *Id.*

42.     The July 19, 2017 Notice was sent to, among others, (1) Tiburon Design

Automation, Inc., 4549 Offner Lane, Santa Rosa, CA 95409, Attn: Marek Mierzwinski;

(2) Tiburon Design Automation, Inc., 613 4th Street, Suite 208A, Santa Rosa, CA 95404, Attn:

Marek Mierzwinski (or Tiburon's designated successor); and (3) Mentor Graphics Corporation,

8005 S.W. Boeckman Road, Wilsonville, Oregon 97070-7777, Attn: Jake Book, via overnight

carrier, facsimile, and personal service.  Exhibit 2.  Copies of the July 19, 2017 Notice letter and

enclosures were also sent to Ravi Subramanian, Patrick O'Halloran, Don Fanelle (Director of

Global Accounts), and Mentor's outside counsel.  *Id.*

43.     With respect to the Offner Lane address, as provided by subsection 15.9 of the

Agreement, Keysight attempted to personally serve the July 19, 2017 Notice letter to that address

(attn: Marek Mierzwinski) six (6) times between July 23, 2017 to July 30, 2017.   But in all

instances, no person was found at this address and there were no responses.  The residence

associated with this address appeared to be unoccupied and no vehicles were found in the

driveway.

44.     With respect to the 613 4th Street address, as provided by subsection 15.9 of the

Agreement, Keysight attempted to personally serve the July 19, 2017 Notice letter to that address

(attn: Marek Mierzwinski or Tiburon's designated successor) five (5) times between July 20, 2017

and August 4, 2017.  But in all instances, no person was found at this address and there were no

responses.  At the time of attempted service, the office associated with this address appeared to be

1   unoccupied.  On information and belief, at least as of the times such personal service was

2   attempted, this address is not used or occupied on a regular basis.

3       45.   With respect to the Oregon address (attn: Jake Book), as provided by

4   subsection 15.9 of the Agreement, Keysight personally served the July 19, 2017 Notice letter to

5   that address by delivering copies of the July 19, 2017 Notice and enclosures to Jake Book or the

6   person authorized to receive process on behalf of Mentor, on July 20, 2017 at 2:00 PM.  Exhibit 9.

7       46.   On July 28, 2017, in its response to the July 19, 2017 Notice, Mentor stated that it

8   disagrees with Keysight's "apparent assertion that Mentor [] has not met its maintenance support

9   obligations" or that the July 19, 2017 Notice "provides proper notice and opportunity to cure any

10  alleged failure by Mentor [] to provide maintenance support."  Exhibit 10.  Despite its receipt of

11  the numerous prior notices, as alleged above, Mentor also requested that Keysight provide a list of

12  defects or bugs that currently exist and asked that Keysight inform Mentor which defects or bugs

13  Keysight contends are covered by Mentor's maintenance support obligations under the

14  Agreement.  *Id.*

15      47.   On August 8, 2017, as requested, Keysight responded in writing by overnight

16  carrier, postage prepaid, to Mentor's July 28 letter, stating that "the only notice required under the

17  Agreement is of Mentor's failure to provide the required maintenance support set forth in Exhibit

18  B-1 to the Agreement" and that such requirement was met by the July 19, 2017 Notice.

19  Exhibit 11.  Nonetheless, Keysight also provided a list of the Software defects to Mentor again,

20  although Mentor had previously been provided with specific information as to what defects or

21  bugs exist and what maintenance support obligations it failed to provide through at least the

22  September 16, 2015 List and the May 27, 2016 List.  *Id.*

23      48.   Keysight has complied with subsections 2.1 and 15.9 of the Agreement at least by

24  sending written notice of Mentor's failure to provide the required maintenance support set forth in

25  Exhibit B-1 to the Agreement to the person (Marek Mierzwinski) and address (the Offner Lane

26  address) via the means (via overnight carrier, facsimile, or personal service) listed in subsection

27  15.9 of the Agreement.  Alternatively, Keysight has complied with subsections 2.1 and 15.9 at

28

COMPLAINT FOR BREACH OF CONTRACT AND       13
SPECIFIC PERFORMANCE – JURY DEMAND
5151395

1   least by sending written notice of Mentor's failure to provide the required maintenance support set

2   forth in Exhibit B-1 to the Agreement to Jake Book, a person designated by Mentor to receive

3   notices under the Agreement, and by means (at least via personal service) listed in subsection

4   15.9.

5         49.    Despite notifying Mentor of its failure to provide the required maintenance support

6   set forth in Exhibit B-1 to the Agreement, and providing, to the extent required, Mentor with the

7   opportunity to cure such failures, more than thirty (30) days have elapsed since at least the

8   delivery and attempted deliveries of the July 19, 2017 Notice letter and the August 8, 2017

9   Supplement, and Mentor has still failed to provide the required maintenance support set forth in

10   Exhibit B-1 to the Agreement, including at least fourteen (14) of the specifically identified defects.

11   To the extent that subsection 2.1 may be read as requiring "notice and opportunity to cure," such

12   requirement has been met through at least the July 19, 2017 Notice letter and August 8, 2017

13   Supplement.

14         50.    Keysight has performed all acts required of it under the Agreement, including

15   without limitation, the acts required by subsections 2.1 and 15.9.  In breach of the Agreement,

16   Mentor has, inter alia, failed to provide the required maintenance support set forth in Exhibit B-1

17   to the Agreement.

18         51.    Subsection 2.1 of the Agreement, as amended, provides: "Tiburon [Mentor] further

19   grants to Agilent [Keysight] a fully-paid up, worldwide, perpetual license to use, copy and modify

20   the Software source code, and to distribute object code versions of the Software or modifications

21   to the Software by Agilent [Keysight] … upon Tiburon [Mentor], or any successor company …

22   failing to provide the required maintenance support set forth in Exhibit B-1 to this Agreement,

23   which failure is not cured within thirty (30) days after receipt of notice thereof from Agilent

24   [Keysight]."  Exhibit 3.  In further breach of the Agreement, Mentor has failed to provide to

25   Keysight the fully paid-up license granted to Keysight under subsection 2.1, and furthermore has

26   failed to provide to Keysight the Software source code that would enable Keysight to fix the

27   identified Software defects.

28

1

**Mentor's Waiver of Notice Under Subsection 15.9**

2       52.     As alleged above, Keysight has complied with the notice requirements of the

3   Agreement and, to the extent required, complied with any notice and opportunity to cure

4   requirements of the Agreement.  Alternatively, as set forth below, the notice requirements of

5   subsection 15.9 have been waived by Mentor through its course of conduct and/or Mentor has

6   intentionally relinquished its right to require compliance with the notice requirements of

7   subsection 15.9, or has otherwise acted in a manner inconsistent with an intent to enforce that right

8   so as to induce a reasonable belief that such right has been relinquished.  Mentor's conduct, e.g. in

9   directing, sending, and in accepting and acting upon, things required or permitted to be given

10  under the Agreement, not by personal service, overnight carrier or by facsimile to or from any of

11  the addressees listed in subsection 15.9, has been inconsistent with any intent to enforce any right

12  to receive notice in compliance with the notice requirements of that subsection.

13      53.     The parties have engaged in a pattern and practice of sending written notices,

14  payments and other written correspondence required or permitted by the Agreement by means,

15  and to addresses and persons other than as identified in subsection 15.9.  In particular, although it

16  did not do so by means specified in subsection 15.9, Mentor, by at least December 2015, directed

17  Keysight to send notices under the Agreement to Ravi Subramanian and Jake Book, persons not

18  identified in subsection 15.9.

19      54.     Since at least some time in 2003, and for all times relevant to this dispute, it has

20  been impractical or impossible to provide notices, invoices, payments or other correspondence to

21  the address and addressee listed in subsection 15.9, to wit: to Tiburon at 4549 Offner Lane, Santa

22  Rosa, California 94509, Attn: Marek Mierzwinski.  As alleged above, this is because, inter alia,

23  Mr. Mierzwinski had moved out of that address and has since become an employee of Keysight.

24  Also as alleged above, Mentor did not provide notice to Keysight in accordance with subsection

25  15.9 of any change of address or addressee.  As to facsimile notice, there is no facsimile number

26  given in the Agreement and at no time did Mentor provide same in accordance with subsection

27  15.9.  Rather, Mentor and Keysight instead engaged in a pattern and practice of sending, and of

28

receiving, acknowledging and acting upon, notices, invoices, payments and other correspondence required or permitted to be given under the Agreement via email and other correspondence, and by means, and as to addresses and addressees other than as identified in subsection 15.9.

55.     For example, Tiburon provided an undated change of address from 4549 Offner Lane, Santa Rosa, California, to 613 4th Street, Suite 208A, Santa Rosa, California, prior to the date Tiburon was acquired by Mentor, but such update was made through Agilent's electronic change request form, and not by one of the means (e.g., facsimile, personal service, overnight carrier) listed in subsection 15.9.  After Mentor's acquisition of Tiburon, Mentor has since corresponded with Keysight under the Agreement via email and correspondence from its headquarters in Oregon.

56.     By its conduct, Mentor has waived any right it has to require that any notices, invoices, payment or other correspondence be given by personal service, overnight carrier (postage prepaid), or by facsimile addressed to the Offner Lane or 613 4th Street, Suite 208A, Santa Rosa, California addresses, or to Mr. Mierzwinski or other designated addressee. Specifically, and as more fully alleged herein, such conduct included sending invoices, accepting payments, and accepting extensions of the term of the Agreement; receiving, acknowledging and acting upon notice of its failures to provide the required maintenance support under the Agreement; by failing to provide to Keysight notice in compliance with subsection 15.9 of any changes of address or addressee under subsection 15.9; and by directing Keysight to send notices and other correspondence under the Agreement by email to various persons at Mentor, including Mr. O'Halloran, Mr. Subramanian and Mr. Book.

57.     For instance, on January 9, 2014, Agilent provided notice to Tiburon that Agilent is exercising its right to extend the term of the Agreement to October 31, 2014.  Exhibit 12.  The notice letter was addressed to Patrick O'Halloran, 613 4th Street, Suite 208A, Santa Rosa, CA 95404.  *Id.*  Mentor had not designated Patrick O'Halloran under subsection 15.9, but never objected to the notice letter based on any lack of formalities or lack of compliance with the

requirements of subsection 15.9, and instead honored and acknowledged the notice, and extended the term.

58.     On April 28, 2014, Agilent provided notice to Tiburon that Keysight is succeeding to all rights and obligations of Agilent with respect to the Agreement.  Exhibit 13.  The notice letter was addressed to Patrick O'Halloran, 613 4th Street, Suite 208A, Santa Rosa, CA  95404.  *Id.*  As alleged above, Mentor had not designated Patrick O'Halloran under subsection 15.9, but Mentor never objected to the notice letter based on any lack of formalities or lack of compliance with subsection 15.9, and instead honored and acknowledged the notice, and acted upon Agilent's assignment of its rights and obligations under the Agreement to Keysight.

59.     On October 29, 2014, Keysight provided notice to Mentor that Keysight is exercising its right to extend the term of the Agreement to October 31, 2015.  Exhibit 14.  The notice letter was also addressed to Patrick O'Halloran, 613 4th Street, Suite 208A, Santa Rosa, CA 95404.  *Id.*  As alleged above, Mentor had not designated Patrick O'Halloran as an addressee under subsection 15.9, but Mentor never objected to the letter based on any lack of formalities or lack of compliance with subsection 15.9, and instead honored and acknowledged the notice, and extended the term.

60.     On or about October 26, 2015, Keysight provided notice to Mentor that Keysight is exercising its right to extend the term of the Agreement to October 31, 2016.  Exhibit 15.  Initially, Mentor requested that "[a]ll contract documents need to go to Ravi Subramanian."  Exhibit 16.  This request, which was sent to Keysight by email, gave Keysight what Mentor regarded as Mr. Subramanian's "full contact info," but Mentor included only his office and cell phone numbers, and his email address, and omitted any street address or facsimile number.  *Id.*  Accordingly, Keysight sent the notice letter to Mr. Subramanian via email.  *Id.*  Upon receiving the notice of extension via email, Mr. Subramanian directed Keysight (by email) to address the notice instead to Jake Book, and provided Keysight with Mr. Book's email address, but gave no street address or facsimile number.  *Id.*  Keysight sent, and Mr. Book received, the notice via email and he confirmed that he is "an appropriate contact for correspondence" regarding the Agreement.

*Id.* Mentor's changes to Mr. Subramanian and to Mr. Book were not in accordance with subsection 15.9, but Keysight acted as directed, and Mentor did not object but rather honored and acknowledged the notice, and extended the term.

61.     On or about October 27, 2016, Keysight provided notice to Mentor that Keysight is exercising its right to extend the term of the Agreement to October 31, 2017.  Exhibit 4. Consistent with Mentor's prior instructions, the notice letter was addressed to Jake Book at 8005 SW Boeckman Road, Wilsonville, OR  97070, and sent to Mr. Book via email.  *Id.*; Exhibit 17. Mentor did not object in any way, and instead Mr. Book confirmed receipt, honored and acknowledged the notice, and extended the term.

62.     On or about October 26, 2016, Keysight sent an email to Jake Book at Mentor, requesting that Mentor provide written consent to allow Keysight to modify the Verilog-A complier program to fix a software bug in the Verilog-A code pursuant to subsection 2.5 of the Agreement.  Exhibit 18.  Mr. Book responded via email that "Mentor has no issue with Keysight making the limited modification" as described.  *Id.*

63.     Prior to Mentor's acquisition of Tiburon, payments made by Agilent/Keysight to Tiburon in connection with the Agreement were sent to either the Offner Lane address or the 613 4th Street address.  After Mentor's acquisition of Tiburon, Mentor requested that Keysight's payments in connection with the Agreement be remitted to Mentor's bank account and checks are to be mailed to P.O. Box 841886, Dallas, TX  75284-1886.  Mentor's request was not made under subsection 15.9 and yet Mentor proceeded to accept all of Keysight's payments made in such manner.

64.     As more fully set forth above, at least by letter dated July 19, 2017, on or about July 20, 2017, Keysight provided written notice of Mentor's failure to provide the required maintenance support under the Agreement to individuals including Jake Book and Ravi Subramanian, those who were designated by Mentor to receive notices under the Agreement. Both Mr. Book and Mr. Subramanian are not listed in subsection 15.9, and Mentor's instruction to send notices to them via email was not given to Keysight by the means set out in subsection 15.9.

Further, the July 19, 2017 Notice and August 8, 2017 Supplement were sent to, among other places, Mentor's Oregon address, which is also not listed in subsection 15.9.  But Mentor did not object to this notice based on any lack of formalities or lack of compliance with the notice requirements of subsection 15.9.  Rather, as alleged herein, Mentor received and acknowledged its receipt of such notices and acted upon them.  Through at least Jake Book and Ravi Subramanian, Mentor had actual notice and knowledge of the Software defects, Mentor's failure to provide the required maintenance support, and Keysight's right to exercise its fully-paid up license to the Software in accordance with subsection 2.1 due to Mentor's failure to cure the defects within the time provided by the Agreement.

65.     At no time during the approximately 14 year relationship between the parties did Mentor object to these written notices and correspondence and payments based on any lack of formalities or lack of compliance with the notice requirements of subsection 15.9 of the Agreement, but rather received, acknowledged, and acted upon them.

66.     In fact, in light of Mentor's failures above to provide notice of change of address or addressee in conformance with subsection 15.9, it would have been futile for Keysight (or Mentor) to have provided notices in literal compliance with subsection 15.9.

67.     As alleged herein, Mentor, through at least Vice President and General Manager Ravi Subramanian and corporate attorney Jake Book, had actual knowledge of the above facts, including notice of Mentor's failure to provide the required maintenance support, and Keysight's right to a fully paid-up license to the Software in light of Mentor's failure to timely cure the noted deficiencies under the Agreement, and in particular, subsection 2.1 as amended by Amendment No. 6.

## FIRST CAUSE OF ACTION

### (Breach of Contract; Specific Performance)

68.     Keysight repeats and realleges the allegations of paragraphs 1 through 67, inclusive, incorporated by reference.

1    69.    The Agreement is a valid and enforceable contract that exists between the parties, supported by good and adequate consideration.

70.    Keysight has performed all conditions, covenants, promises and obligations required of it under the Agreement.

71.    As set forth above, Mentor is in breach of the Agreement.

72.    As an actual and legal cause of Mentor's breach, Keysight has suffered damages and irreparable harm.

73.    As an actual and legal cause of Mentor's breach, Keysight is entitled to specific performance of the Agreement, including Mentor providing Keysight with the Software in source code form, and a corresponding fully-paid up, worldwide, perpetual license to use, copy and modify the Software source code, so as to permit Keysight to use, copy and modify the Software source code in order to remedy the Defects and enable Keysight to distribute to its end-user customers the Software in object code form, as well as enable Keysight to perform all other acts permitted under the Agreement.

## PRAYER FOR RELIEF

WHEREFORE, Keysight prays for judgment in its favor and against Mentor as follows:

1.    For an order and judgment decreeing that Mentor shall specifically perform its obligations and duties as set forth in Agreement, including delivering to Keysight the Software in source code form and pursuant to a fully-paid up, worldwide, perpetual license to use, copy and modify the Software source code, and to distribute object code versions of the Software or modifications to the Software for the purposes permitted under the Agreement;

2.    For damages according to proof;

3.    For permanent injunctive relief and specific performance according to proof;

4.    For costs of suit herein; and

5.    For such other relief as the Court may deem just and proper.

1
2

## **JURY DEMAND**

Keysight hereby demands a jury trial on all issues so triable.

3
4

Dated:  September 8, 2017                              VINSON & ELKINS L.L.P.

5
6

By:      */s/ Darryl M. Woo*
                                                Darryl M. Woo

7
8

Attorneys for Plaintiff
Keysight Technologies, Inc.

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28